# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| **DANNY R. GARDNER, II,** ) | |
|    Plaintiff ) | |
| ) | |
| ) | Civil Action No. 2:14cv00002 |
| ) | **MEMORANDUM OPINION** |
| **CAROLYN W. COLVIN,** ) | |
|  **Acting Commissioner of Social Security,** ) | By: PAMELA MEADE SARGENT |
|    Defendant ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Danny R. Gardner, II, ("Gardner"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the

case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Gardner protectively filed his application for SSI on December 29, 2009, alleging disability as of March 3, 2004, due to panic attacks, severe asthma, sleeping disorder, migraines, depression and severe allergies. (Record, ("R."), at 149-52, 153, 157.) The claims were denied initially and on reconsideration. (R. at 66-70, 72, 78-80, 82-84.) Gardner then requested a hearing before an administrative law judge, ("ALJ"). (R. at 85-86.) A hearing was held on September 4, 2012, at which Gardner was represented by counsel. (R. at 28-45.)

By decision dated September 19, 2012, the ALJ denied Gardner's claim. (R. at 14-23.) The ALJ found that Gardner had not engaged in substantial gainful activity since December 29, 2009, the date of his application. (R. at 16.) The ALJ determined that the medical evidence established that Gardner suffered from severe impairments, including anxiety/panic disorder, depression, personality disorder, asthma, migraines and history of seasonal allergies, but he found that Gardner did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16-17.) The ALJ found that Gardner had the residual functional capacity to perform simple, routine, repetitive unskilled medium work[1] that required no more than occasional interaction with co-workers and supervisors and that did not require interaction with the public.[2] (R. at 17.) The ALJ found that Gardner had no

---

[1] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. § 416.967(c) (2014).

[2] The ALJ placed a number of exertional limitations on Gardner's work-related abilities. (R. at 17.) However, because Gardner does not challenge the ALJ's findings with regard to his physical impairments, the undersigned will focus on the facts relevant to Gardner's alleged mental impairments.

past work. (R. at 22.) Based on Gardner's age, education, lack of work experience and residual functional capacity and the testimony of a vocational expert, the ALJ also found that Gardner could perform jobs existing in significant numbers in the national economy, including jobs as a food preparation worker, an inventory checker and a sample packager. (R. at 22-23.) Therefore, the ALJ found that Gardner was not under a disability as defined under the Act and was not eligible for benefits. (R. at 23.) *See* 20 C.F.R. § 416.920(g) (2014).

After the ALJ issued his decision, Gardner pursued his administrative appeals, (R. at 7-10), but the Appeals Council denied his request for review. (R. at 1-5.) Gardner then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2014). The case is before this court on Gardner's motion for summary judgment filed June 24, 2014, and the Commissioner's motion for summary judgment filed July 11, 2014.

## *II. Facts*[3]

Gardner was born in 1991, (R. at 149), which classifies him as a "younger person" under 20 C.F.R. § 416.963(c). Gardner has a high school education.[4] (R. at 32.) He has no work experience. (R. at 33.) At the time of Gardner's hearing, he

---

[3] Gardner does not challenge the ALJ's finding with respect to his alleged physical impairments. Therefore, the discussion of the medical evidence will be limited to those records pertaining to Gardner's mental health. Further, the undersigned's consideration of medical records is limited to those pertinent to the relevant time period of March 3, 2004, the alleged disability onset date, through September 19, 2012, the date of the ALJ's decision. To the extent that medical records pertaining to dates not pertinent to the relevant time period are contained herein, it is for clarity of the record.

[4] Gardner testified that he was home schooled. (R. at 32.) It was reported on his Disability Report that he was unable to attend public school due to his anxiety problems. (R. at 168.)
-3-

was not receiving any psychological treatment, and he had not visited the emergency room for anxiety or mental health conditions. (R. at 32, 34.) Gardner stated that he did not like to be in a crowd of people and that he would get "nervous" when he was by himself. (R. at 33.) The only medication that he was taking at the time of his hearing was an inhaler for his asthma. (R. at 33-34.) Gardner stated that he experienced panic attacks daily, which lasted three to five hours. (R. at 36-37.) He stated that he had never obtained a driver's license because he was "too afraid" of having an accident. (R. at 38.) Gardner stated that his medication helped "a bit" by taking the edge off, but that he still had problems. (R. at 39.) He stated that he had no problems with his memory or concentration. (R. at 39.) He stated that he got "stressed out just thinking" about trying to find a job and would have anxiety attacks. (R. at 39-40.)

Cathy Sanders, a vocational expert, also was present and testified at Gardner's hearing. (R. at 41-43.) Sanders was asked to consider a hypothetical individual of Gardner's age, education and lack of work experience, who could perform medium work, but who would be limited to simple, routine, repetitive and unskilled tasks that required no more than occasional interaction with co-workers or supervisors and that did not require him to work with the public. (R. at 41.) She stated that such an individual could perform jobs existing in significant numbers in the national economy, including those of a food preparation worker, an inventory checker and a sample packager.[5] (R. at 41-42.) Sanders stated that all jobs would be eliminated if the individual experienced panic attacks daily, was unable to be around a crowd of people and was unable to be alone. (R. at 42.) Sanders stated that these limitations would cause the individual to have poor attendance and to be off task up to 25 percent of the workday. (R. at 42.) The ALJ stipulated that there

---

[5] These jobs are classified at the light exertional level. (R. at 41-42.) The ALJ stated that he would accept jobs at the light exertional level. (R. at 42.)

would be no jobs available that an individual could perform if he was limited as found by Dr. Uzma Etesham, M.D., a psychiatrist. (R. at 43, 522-24.)

In rendering his decision, the ALJ reviewed records from Wise County Schools; Richard J. Milan, Jr., Ph.D., a state agency psychologist; Appalachian Healthcare Associates, P.C.; Dr. Uzma Ehtesham, M.D., a psychiatrist; Lonesome Pine Pediatrics; Michael Williams, L.C.S.W., a licensed clinical social worker; Maurice Prout, Ph.D., a state agency psychologist; Frontier Health; Dr. Linda R. Thompson, M.D., a psychiatrist; D. Kaye Weitzman, L.C.S.W., a licensed clinical social worker; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; and Wise County Behavioral Health Services.

Gardner's sixth grade records from Wise County Schools for the 2003-04 school year show that he had excellent work habits, excellent classroom behavior and excellent overall school conduct. (R. at 204-06.)

On January 29, 2003, Michael Williams, L.C.S.W., a licensed clinical social worker, saw Gardner for panic attacks and anxiety associated with his school environment and social situations. (R. at 325-29.) Williams diagnosed social phobia and the need to rule out panic disorder. (R. at 329.) He assessed Gardner's then-current Global Assessment of Functioning, ("GAF"),[6] score at 55[7] with his

---

[6] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[7] A GAF score of 51 to 60 indicates that the individual has "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning…." DSM-IV at 32.

highest GAF score being 76[8] within the past year. (R. at 329.) On February 13, 2003, Williams rated Gardner's anxiety at a four on a scale of one to 10. (R. at 342.) He reported that Gardner's mood was stable. (R. at 342.) On February 25, 2003, Williams rated Gardner's anxiety at a three on a scale of one to 10. (R. at 337.) He reported Gardner's attention and concentration was mildly decreased, and his mood was stable. (R. at 337.) On March 13, 2003, Williams rated Gardner's anxiety at a three on a scale of one to 10. (R. at 335.) He reported Gardner's attention and concentration was mildly decreased, and his mood was stable. (R. at 335.) On April 10, 2003, Williams rated Gardner's depression and anxiety at a three on a scale of one to 10. (R. at 333.) Williams noted that Gardner's mood was stable. (R. at 333.)

By letter to Gardner's attorney dated January 12, 2004, Williams reported that Gardner was guarded and sullen. (R. at 324.) Both Gardner and his mother described extreme anxiety and panic when Gardner was faced with unfamiliar surroundings and/or crowded environments. (R. at 324.) Gardner described anxiety when engaged in a school classroom environment, stating that he became very nervous and shaky, unable to think clearly and had a strong desire to run out of the room. (R. at 324.) Williams reported that Gardner had experienced these symptoms for at least three years. (R. at 324.) Williams diagnosed generalized social phobia with anxiety, panic episodes and moderate social isolation. (R. at 324.) Williams assessed Gardner's then-current GAF score at 51 with his highest score being 66[9] during the past year. (R. at 324.)

---

[8] A GAF score of 71 to 80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors ...; no more than slight impairment in social, occupational, or school functioning...." DSM-IV at 32.

[9] A GAF score of 61 to 70 indicates "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ... but generally functioning pretty well ...." DSM-IV at 32.

In February and May 2003, Gardner saw Dr. Linda R. Thompson, M.D., a psychiatrist, for depression and panic attacks. (R. at 331, 338-40.) Dr. Thompson noted that Gardner's memory and thought processes were intact, and he had good insight and judgment. (R. at 331.) She diagnosed panic disorder with agoraphobia, obsessive-compulsive disorder and dysthymic disorder. (R. at 331, 338.) She assessed Gardner's then-current GAF score at 40,[10] with his highest score being 40 over the past year. (R. at 331, 338.)

On September 12, 2003, D. Kaye Weitzman, L.C.S.W., a licensed clinical social worker, saw Gardner. (R. at 343-45.) Gardner's mother reported that she had "lost control." (R. at 343.) Gardner was described as having poor social skills and refused to obey his mother. (R. at 343.) Gardner stated that he was mad because his dad left him and his family and that he "could have killed him for what he did." (R. at 343.) It was reported that Gardner did well at school, but had defiant issues at home. (R. at 344.) Weitzman diagnosed oppositional defiant disorder and anxiety disorder. (R. at 344.) She assessed Gardner's then-current GAF score at 70, with his highest GAF score being 70 over the past year. (R. at 344.)

The record shows that Dr. Uzma Ehtesham, M.D., a psychiatrist, treated Gardner from March 2005 to July 2005 for generalized anxiety disorder. (R. at 461-63.) She then began treating him again in January 2007 through February 2010 for depression and anxiety. (R. at 249-303.) During 2007, Gardner reported that his depression was improving and that his anxiety and anger had lessened. (R. at 295-96, 300.) Dr. Ehtesham reported that Gardner generally had an appropriate affect, fair concentration and memory and normal judgment. (R. at 289-301.) In

---

[10] A GAF score of 31 to 40 indicates that the individual has "[s]ome impairment in reality testing or communication ... OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood ...." See DSM-IV at 32.

2008, Gardner reported that his anxiety and mood swings had lessened. (R. at 284, 292.) Dr. Ehtesham reported that Gardner's insight was good, his judgment was intact, and he was goal oriented. (R. at 289-92, 294.) Dr. Ehtesham rated Gardner's anxiety level at a two and three on a scale of one to 10 and his depression level at a two on a scale from one to 10. (R. at 284, 292, 294.) In November 2008, Dr. Ehtesham diagnosed major depressive disorder and generalized anxiety disorder. (R. at 291.) She assessed Gardner's then-current GAF score at 60. (R. at 291.)

In January 2009, Gardner reported increased anxiety. (R. at 282.) His anxiety level was rated an eight on a scale of one to 10. (R. at 282.) He was started on Zoloft. (R. at 282.) In March 2009, Gardner reported ongoing depression, which was not helped by medication. (R. at 278.) On April 30, 2009, Gardner reported that he was less depressed and that his anxiety was less severe. (R. at 274.) His anxiety level was rated three on a scale of one to 10, and his depression level was rated a five on a scale of one to 10. (R. at 274.) Dr. Ehtesham reported that Gardner had fair insight and intact judgment. (R. at 274.) On May 11, 2009, Gardner complained of decreased concentration and worsening depression. (R. at 272.) On May 27, 2009, Gardner reported that he was more depressed, but had decreased anxiety. (R. at 270.) On July 9, 2009, Dr. Ehtesham reported that Gardner was stable and that his anxiety was less severe. (R. at 268.) On October 8, 2009, Gardner reported that his depression was severe and that his anger had increased. (R. at 264.) On November 2, 2009, Gardner reported that Lexapro made him angry and agitated. (R. at 262-63.) On November 19, 2009, Gardner reported that he was afraid to start taking his new medication. (R. at 260.)

On January 4, 2010, Gardner reported that his anxiety attacks were worse in the evenings, and his panic attacks were becoming more severe. (R. at 256.) Dr. Ehtesham rated Gardner's anxiety level at three on a scale of one to 10. (R. at 256.)

-8-

She reported that Gardner's insight was fair, his judgment was intact, and he was goal-oriented. (R. at 256.) On February 2, 2010, Gardner reported that his mood swings and anxiety had lessened. (R. at 254.) On February 19, 2010, Dr. Ehtesham noted that Gardner's depression was "off and on." (R. at 249.) She noted that Gardner's relationship with family and friends had decreased. (R. at 249.) Dr. Ehtesham noted that Gardner was cooperative, oriented, sad and very hyper. (R. at 250.) Gardner was described as a concrete thinker, who had decreased concentration and poor judgment. (R. at 251.) No symptoms of isolation or seclusiveness were noted. (R. at 252.)

On March 19, 2010, Dr. Ehtesham completed a mental assessment indicating that Gardner had a seriously limited ability to follow work rules, to relate to co-workers, to interact with supervisors, to understand, remember and carry out complex instructions, to maintain personal appearance and to demonstrate reliability. (R. at 465-67.) She opined that Gardner had no useful ability to deal with the public, to use judgment, to deal with work stresses, to function independently, to maintain attention/concentration, to understand, remember and carry out detailed and simple instructions, to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 465-66.) Dr. Ehtesham opined that Gardner was permanently disabled. (R. at 467.)

On June 23, 2010, Gardner reported that his anxiety had decreased on Ativan. (R. at 517.) On October 19, 2010, Dr. Ehtesham reported that Gardner's anxiety was improving. (R. at 508.) His anxiety level was rated a two on a scale of one to 10. (R. at 508.)

On March 6, 2012, Dr. Ehtesham completed a mental assessment indicating that Gardner had a seriously limited ability to follow work rules, to use judgment,

-9-

to interact with supervisors, to understand, remember and carry out complex instructions, to maintain personal appearance and to demonstrate reliability. (R. at 522-24.) She opined that Gardner had no useful ability to relate to co-workers, to deal with the public, to deal with work stresses, to function independently, to maintain attention/concentration, to understand, remember and carry out detailed and simple instructions, to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 522-23.) Dr. Ehtesham opined that Gardner would be absent from work more than two days a month. (R. at 524.)

The record shows that Gardner was treated at Wise County Behavioral Health Services from March 2008 through September 2008 for depression and anxiety. (R. at 543-75.) In April 2008, it was reported that Gardner appeared to be providing a partner/support relationship for his mother and a substitute father figure for his younger brother. (R. at 556.) Gardner appeared to be his mother's main support system. (R. at 556.) It was noted that Gardner was a rational thinker and had the ability to remain calm. (R. at 556.) In July 2008, Gardner expressed a desire to attend college and to obtain a part-time job, but stated that he had to devote a lot of his time to support the basic needs of his mother and younger brother. (R. at 548.) Upon discharge from treatment, it was noted that Gardner was experiencing depressive and anxiety symptoms. (R. at 573.) His family environment and relationship dynamics contributed to his stress. (R. at 573.)

On April 14, 2011, Tracy S. Anderson, R.N., a registered nurse, at Wise County Behavioral Health Services, screened Gardner for mental health services. (R. at 540-42.) Gardner reported that he was not receiving any mental health treatment because he no longer had insurance. (R. at 541.) He reported that Ativan was fairly effective at controlling his anxiety, although he still experienced panic attacks. (R. at 541.) Anderson assessed Gardner's then-current GAF score at 65,

with his highest GAF score being 65 within the past six months, and his lowest GAF score being 63 within the past six months. (R. at 541.) On May 23, 2011, Gardner reported experiencing four to five anxiety attacks a week. (R. at 518.) He stated that he had difficulty being in large crowds of people. (R. at 518.) Gardner was diagnosed with generalized anxiety disorder and generalized depressive disorder. (R. at 520.) His then-current GAF score was assessed at 50,[11] with his highest score being assessed at 55 over the previous six months. (R. at 520.) On June 20, 2011, Gardner reported that he was doing okay. (R. at 528.) He reported that he visited the library from time to time. (R. at 528.) Maria K. Dizney, M.Ed., encouraged him to socialize with someone in the library. (R. at 528.) Dizney reported that Gardner was well-oriented, his thought process was intact, his mood was depressed with a congruent affect, he spoke in a low voice tone, his eye contact was staring, his appearance was disheveled, and he had no suicidal/homicidal ideation or hallucinations. (R. at 528.)

On August 17, 2010, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, evaluated Gardner at the request of Disability Determination Services. (R. at 583-89.) Gardner reported that he did not have a driver's license because he was "too scared to drive." (R. at 583.) Gardner reported experiencing three panic attacks a day, which typically lasted 15 minutes. (R. at 586.) He stated that he helped with housework, such as sweeping the floors, mopping and taking out the trash. (R. at 585.) He attended church at times, but socialized exclusively with his mother and brother. (R. at 585.) Gardner stated that he had no friends. (R. at 585.) Lanthorn reported that Gardner displayed no signs of ongoing psychotic processes or any evidence of delusional thinking. (R. at 586.) Gardner denied having hallucinations of any type. (R. at 586.) He stated that taking care of his

---

[11] A GAF score of 41 to 50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning...." DSM-IV at 32.

-11-

brother was very stressful. (R. at 586.) Lanthorn reported that Gardner sat in a very constricted fashion, had mild tremulousness to his hands, made erratic to poor eye contact, was clearly uncomfortable during the interview and was fidgeting in his chair. (R. at 587.) Lanthorn diagnosed panic disorder with agoraphobia; generalized anxiety disorder; rule out dysthymic disorder; and personality disorder, not otherwise specified. (R. at 588.) He assessed Gardner's then-current GAF score at 50 to 55. (R. at 588.)

Lanthorn deemed Gardner's psychological prognosis to be somewhat guarded. (R. at 588.) Lanthorn concluded that Gardner would have no limitations in learning simple and moderately complicated workplace tasks, mild limitations sustaining concentration and persisting at tasks in an effective fashion, mild to moderate limitations at dealing with changes in the requirements of the workplace and moderate or greater limitations in interacting with others in the workplace to include co-workers, the general public and supervisors. (R. at 589.)

On December 22, 2010, Maurice Prout, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding that Gardner suffered from an anxiety-related disorder and a personality disorder. (R. at 482-92.) He opined that Gardner was mildly restricted in his activities of daily living, had marked difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence or pace. (R. at 490.) Prout opined that Gardner had experienced one or two repeated episodes of decompensation of extended duration. (R. at 490.)

That same day, Prout completed a mental assessment finding that Gardner was moderately limited in his ability to understand, remember and carry out detailed instructions, to work in coordination with or proximity to others without

being distracted by them, to interact appropriately with the public, to accept instructions and respond appropriately to criticism from supervisors and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes and to adequately interact with supervisors, co-workers and the public. (R. at 493-95.) Prout found that Gardner was able to understand and follow simple instructions on a sustained basis. (R. at 495.)

On May 19, 2011, Richard J. Milan, Jr., Ph.D., a state agency psychologist, completed a PRTF finding that Gardner was mildly restricted in his activities of daily living, had moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation of extended duration. (R. at 55.) Milan noted that the evidence revealed anxiety and personality symptoms of moderate severity, but that Gardner's mental status was without serious abnormalities. (R. at 55.)

Milan also completed a mental assessment finding that Gardner was moderately limited in his ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 57-58.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2014); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2014).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2014); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Gardner argues that the ALJ erred by making incomplete findings at step three of the sequential evaluation process. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-5.) Gardner also argues that the ALJ failed adhere to the treating physician rule and accord controlling weight to the opinion of Dr. Ehtesham. (Plaintiff's Brief at 5-6.) As

noted above, Gardner does not challenge the ALJ's findings as to his physical impairments or his physical residual functional capacity.

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(c), if he sufficiently explains his rationale and if the record supports his findings.

After a complete review of the evidence of record, I find Gardner's arguments unpersuasive. Gardner argues that the ALJ failed to sufficiently articulate his findings at step three of the sequential process. He specifically argues that the ALJ did not adequately explain the basis for his "paragraph B" criteria findings for not finding him disabled under the medical listings for affective

disorders, anxiety-related disorders and personality disorders, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.04(A), 12.06 and 12.08, respectively. (Plaintiff's Brief at 4-5.)

Under the regulations, to meet the "paragraph B" criteria for these listings at step three of the sequential process, two of the following requirements must be met:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(B), 12.06(B), 12.08(B) (2014). The ALJ found that the medical evidence established that Gardner had mild restrictions in his activities of daily living, moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and no episodes of decompensation of extended duration. (R. at 17.) The regulations define a "marked" limitation as more than moderate but less than extreme. *See* 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(C) (2014). The term "repeated episodes of decompensation, each of extended duration" means three episodes within one year or an average of once every four months, each lasting for at least two weeks. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(4) (2014).

In addition, I find Gardner's argument that the ALJ erred by failing to accord greater weight to the opinion of Dr. Ehtesham unpersuasive. (Plaintiff's Brief at 5-6.) The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a

-16-

Case 2:14-cv-00002-PMS   Document 18   Filed 03/31/15   Page 16 of 18   Pageid#: 674

major part of the proof of disability cases. *See McLain*, 715 F.2d at 869. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 416.927(c)(2) (2014). However, "[c]ircuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

The ALJ noted that he was giving little weight to Dr. Ehtesham's opinions because they were inconsistent with her own treatment records and the other opinions of record. (R. at 20.) For instance, Dr. Ehtesham noted that Gardner generally had an appropriate affect, fair insight, fair ability to concentrate and remember and intact judgment. (R. at 256, 274, 286-301.) Dr. Ehtesham's progress notes also indicate that Gardner's depression was improving, and his anxiety and anger were lessening. (R. at 254, 268, 274, 284, 292, 295-96, 300.) Dr. Ehtesham consistently rated Gardner's anxiety level at two or three on a one to 10 scale. (R. at 256, 274, 284, 292, 294.) In June 2010, Dr. Ehtesham noted that Gardner's anxiety was less on Ativan, and in 2011, Gardner reported that Ativan was fairly effective at controlling his anxiety. (R. at 517, 541.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *See Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

Lastly, I find that the other substantial evidence of record does not support Dr. Ehtesham's opinions. For instance, Lanthorn diagnosed Gardner with panic disorder without agoraphobia; generalized anxiety disorder; and personality

-17-

disorder, not otherwise specified. (R. at 588.) Lanthorn found that Gardner was oriented in all spheres and had normal memory and judgment. (R. at 588.) Lanthorn found that Gardner had mild limitations in his ability to sustain concentration and persist at tasks and moderate or greater limitations in his ability to interact with others in the workplace, including co-workers, the general public and supervisors. (R. at 589.) State agency psychologist Milan opined that Gardner had a mild restriction of activities of daily living, moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and no episodes of decompensation of extended duration. (R. at 55.) Furthermore, it was noted in 2003 that Gardner did well in school, and school records indicate that he had excellent work habits, excellent classroom behavior and excellent overall school conduct. (R. at 204-06, 344.) In 2008, Gardner stated that he had a desire to attend college and to obtain a part-time job. (R. at 548.) He also stated that he had no problems getting along with family, friends, neighbors or others and that he was able to get along "very well" with authority figures. (R. at 176-77.)

It is for all of these reasons stated herein that I find that substantial evidence supports the ALJ's weighing of the psychological evidence. That being so, I further find that substantial evidence supports the ALJ's finding as to Gardner's mental residual functional capacity and his finding that he was not disabled. An appropriate order and judgment will be entered.

DATED: March 31, 2015.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE